# IN THE COURT OF APPEALS OF IOWA

No. 18-1954
Filed March 6, 2019

**IN THE INTEREST OF D.S.,**
**Minor Child,**

**S.S., Father,**
 Appellant.

_____

Appeal from the Iowa District Court for Polk County, Joseph Seidlin, District

Associate Judge.

A father appeals the juvenile court decision terminating his parental rights.

**AFFIRMED.**

Robert Stone of Parrish Kruidenier Dunn Boles Gribble Gentry Brown &

Bergmann, L.L.P., Des Moines, for appellant mother.

Thomas J. Miller, Attorney General, and Meredith L. Lamberti, Assistant

Attorney General, for appellee State.

Kayla Stratton of Juvenile Public Defender Office, Des Moines, attorney and

guardian ad litem for minor child.

Considered by Potterfield, P.J., and Tabor and Bower, JJ.

**BOWER, Judge.**

A father appeals the juvenile court decision terminating his parental rights. We find there is clear and convincing evidence in the record to support termination and the State engaged in reasonable efforts to reunite the father with the child. We also find termination is in the child's best interest. We affirm the juvenile court.

## I.       Background Facts & Proceedings

S.S., father, and A.C., mother, are the parents of D.S., born in 2016. The child was removed from the parents' care on August 15, 2017, due to the mother's drug use. The child was placed with the maternal grandmother. The father, who is sixty-five years of age, has a lengthy history spanning twenty years of criminal conduct. He was incarcerated at the time of the child's birth and remained incarcerated throughout the juvenile court proceedings. He had one video visit when the child was an infant.

On October 10, at fifteen months of age, the child was adjudicated to be in need of assistance under Iowa Code section 232.2(6)(c)(2) and (n) (2017). In the dispositional order, filed on December 7, the juvenile court ordered the Iowa Department of Human Services (DHS) to evaluate the appropriateness of visits between the father and the child. DHS reported it would require a trip of two and one-half hours each way for the child to visit the father in prison, or five hours in total. Also, the child's therapist recommended against visits. DHS stated, "At this time, due to the lack of relationship, long car drive for a very young child and the therapist recommendation of not having visits, and not being eligible for parole for two years, the Department is not recommending visits at this time." DHS sent a picture of the child to the father.

Shortly before a permanency hearing held on July 5, 2018, the father was moved to a different facility, which was a forty-five minute trip each way from where the child was residing, or ninety minutes in total. In the permanency order, the juvenile court stated visits would be within the discretion of DHS. The order also directed the county attorney to institute termination proceedings due to the lack of progress by the parents.[1]

On July 25, the State filed a petition seeking to terminate the parents' rights. At the termination hearing held on September 20, two months after the permanency hearing, the father testified his discharge date from prison was projected to be in 2045, but he could be released on parole as early as March 2019. He stated there were three or four previous times when his parole had been revoked and other times his probation was revoked. The father stated when he was released from prison he hoped to enter an inpatient substance-abuse treatment program. He admitted the child could not be returned to his care at that time due to his incarceration and indicated it would be a substantial time before he would be in a position to care for the child.

The juvenile court terminated the father's parental rights under section 232.116(1)(h) (2018).[2] The court determined the State made reasonable efforts to reunite the father with the child, finding DHS reasonably concluded "visits between [D.S.] and [S.S.] should not happen while [S.S.] remained in prison." The court also found termination of the parents' rights is in the child's best interest and no

---

[1] The father filed an interlocutory appeal of this order, which was denied by the Iowa Supreme Court.
[2] The juvenile court also terminated the parental rights of the mother. She has not appealed.

exceptions from section 232.116(3) applied in the case. The father appeals the juvenile court's order.

## II. Standard of Review

Our review of termination-of-parental-rights cases is de novo. *In re A.B.*, 815 N.W.2d 764, 773 (Iowa 2012). "There must be clear and convincing evidence of the grounds for termination of parental rights." *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). Where there is clear and convincing evidence, there are "no serious or substantial doubts as to the correctness or conclusions of law drawn from the evidence." *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010) (citation omitted). The paramount concern in termination proceedings is the best interest of the child. *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006).

## III. Sufficiency of the Evidence

The father claims the State did not present sufficient evidence to justify termination of his parental rights. He claims there was not clear and convincing evidence the child could not be safely returned to his care because the State did not engage in reasonable efforts to reunite him with his child. He states DHS should have done more to provide him with visits with the child.

"The State must show reasonable efforts as a part of its ultimate proof the child cannot be safely returned to the care of a parent." *In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000). "Generally, the DHS must make reasonable efforts to provide services to eliminate the need for removal." *In re M.B.*, 553 N.W.2d 343, 345 (Iowa Ct. App. 1996). The concept of reasonable efforts "includes visitation designed to facilitate reunification while providing adequate protection for the child." *C.B.*, 611 N.W.2d at 493. For incarcerated parents, DHS should consider:

the age of the children, the bonding the children have or do not have with their parent, including any existing clinical or other recommendations concerning visitation, the nature of parenting deficiencies, the physical location of the child and the parent, the limitations of the place of confinement, the services available in the prison setting, the nature of the offense, and the length of the parent's sentence.

*In re S.J.*, 620 N.W.2d 522, 525 (Iowa Ct. App. 2000).

We find DHS appropriately considered all of the pertinent factors set out above. The child was quite young, about one and one-half. The child and father were not bonded because they had never met as the father was once again incarcerated. There was one video visit during the child's life. The child's therapist recommended against visits. The child's trip to visit the father in prison would have involved five hours of driving. The father was in prison on drug-related charges. The father's sentence is set to expire in 2045 unless the father is granted parole. The father's first parole hearing is scheduled in March 2019. The father admitted he would not be able to begin caring for the child for a substantial period of time if released.

Based on a consideration of all of these factors, we find the services offered to the father were reasonable under the circumstances. *See id.* ("The services required to be supplied to an incarcerated parent, as with any other parent, are only those that are reasonable under the circumstances."). Although additional visits may have helped to form a bond between the father and child, the circumstances surrounding this father and child are not of a nature that additional visits would have outweighed the immediate needs of the child. *See M.B.*, 553 N.W.2d at 345 ("[N]o evidence indicated increased visitation would help [the

parent] respond to the various services offered by the DHS and assist her in becoming a better parent.").

We conclude the juvenile court properly determined the father's parental rights should be terminated under section 232.116(1)(h). The father testified the child could not be placed with him at the time of the termination hearing because he was incarcerated.

## IV. Best Interest

The father claims termination of his parental rights is not in the child's best interest. He states the juvenile court should have given him a six-month extension. The father notes he "might be" granted parole in March 2019

In considering a child's best interest, we give primary consideration to the child's safety, the long-term growth and nurturing of the child, and the child's physical, mental, and emotional condition and needs. *See In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010) (citing Iowa Code § 232.116(2)).

On our de novo review, we find termination of the father's parental rights is in the child's best interest. As the juvenile court noted, it is unknown if the father will be paroled soon, and even if he is paroled, "it would be a substantial time after that before he would be in any position to have [D.S.] in his care. Given [S.S.'s] history of drug addiction and criminal recidivism, [S.S.] would have much to prove after discharge of his sentence before having the child placed in his custody." We are concerned about the father's true insight into his addiction issues and what it will take to overcome a long history of drug use. Additionally, the father often stated that the child will help him stay sober and the child will make him do the right thing. The father must stay sober and do the right thing, not the child. Given

the father's long history of drug abuse, his substantial prison sentence, his lack of bonding with the child, and the recommendation of the parties, we conclude it would not be in the child's best interest to give the father additional time.

We affirm the juvenile court decision terminating the father's parental rights.

**AFFIRMED.**

Potterfield, P.J., concurs; Tabor, J., dissents.

**TABOR, Judge** (dissenting).

I respectfully disagree with the majority's decision to affirm the order terminating the incarcerated father's parental rights. I believe by not offering any visitation with D.S., despite the father's persistent requests, the State failed to satisfy the reasonable-efforts requirement.

As the majority aptly points out, to fulfill its reasonable-efforts mandate, the State must show it considered relevant factors bearing on the reasonableness of facilitating visitation between the child and her incarcerated parent.[3] *See In re S.J.*, 620 N.W.2d 522, 525 (Iowa Ct. App. 2000). To its credit, the State was aware of that mandate here. But the DHS was slow to address the factors listed in *S.J.* And the DHS decision to deny the father any visitation with his daughter based on those factors is not well-supported in this record.

Too often, parents' attorneys do not advocate early enough for services to be offered to their incarcerated clients. *See, e.g.*, *In re L.M.*, 904 N.W.2d 835, 840 (Iowa 2017) (holding mother's reasonable-efforts contention was untimely "in the absence of any objection to the failure of DHS to provide for visitation during [her] incarceration"). This case does not fall into that category. The father's counsel asked for visitation early and often. Counsel first broached the subject at the October 2017 child-in-need-of-assistance (CINA) adjudication hearing, explaining his client was "extremely interested in some type of contact" with D.S. The juvenile

---

[3] The father was sixty-five years old at the time of the termination hearing. He was a Vietnam War veteran and retired postal worker. He raised three children without any DHS involvement. But after what he termed a "bad divorce"—in his mid-forties—he started to engage in criminal conduct, including drug dealing. In January 2016, six months before D.S. was born, police arrested the father for the felony drug offense resulting in his current incarceration.

court ordered the DHS "to assess appropriate contact for father and child while he is in prison." At that point, the Iowa Department of Corrections (DOC) had assigned the father to the Mount Pleasant Correctional Facility.

The father's attorney renewed the request for visitation at a December 2017 dispositional hearing. The court's order following the hearing indicated it was still awaiting "[e]valuation of the appropriateness of visits between father and child." Yet, despite the passage of four months since the child's removal, no visitation offered to her incarcerated father, and no rationale for its denial, the juvenile court found the DHS had made reasonable efforts to reunify the family. In my view, it was unreasonable for the DHS to drag its feet for so long in assessing the appropriateness of visitation.

The DHS addressed the father's visitation request for the first time in its January 2018 report to the court. The social worker gave four reasons weighing against visits: (1) no bond (the father had only one video interaction with D.S. before the CINA proceeding); (2) the child's age (eighteen months); (3) the distance to the prison from the child's placement in West Des Moines (a five-hour round-trip drive); and (4) a letter from the child's therapist recommending the child not visit the father in Mount Pleasant. We have no idea why the therapist reached that recommendation. The State never offered the therapist's letter as an exhibit nor was the therapist ever called as a witness.

At the father's request, in early July 2018, the DOC moved him to the Newton Correctional Facility, which was "a much closer trip" to his daughter's residence. The father continued to ask for visits with D.S. at the July 2018 permanency hearing. He testified: "I was told that the DHS . . . wouldn't bring my

child to see me. It was too far to go. So I put in for the transfer so I would be close enough to my child to start the reunification, visiting thing." The father told the court he was "very active in parenting classes" while incarcerated, including programs called DHS 101, 24/7 Dads, and Incarcerated Fathers. He also testified to paying child support of $200 per month, as well as sending books to D.S. The juvenile court found the father was "very sincere in his desire to have a relationship with his daughter" and "very earnest about wanting to have that relationship." But citing the strict statutory time limits for out-of-home placements, the court ordered the State to file a termination petition and left visitation with the father "within the discretion of the DHS."

It does not appear the DHS updated its assessment of the propriety of visitation after the father's transfer to Newton, or in light of D.S. reaching the two-year milestone. At the termination hearing in September 2018, the father testified no visits materialized despite the fact he had been "a model prisoner" and successfully sought a move closer to D.S. The father testified he would still like to visit with his daughter.

The Family Safety, Risk, and Permanency (FSRP) worker also testified at the termination hearing. She expressed the opinion "introducing visits . . . at a facility would be highly disruptive for a two-year-old." But the worker admitted she had no personal experience in arranging visits at DOC facilities.

At the close of the evidence, the father's counsel argued "there was virtually no record as to the justification made over the course of this case" to deny all visitation between D.S. and her father. If distance was the main impediment when the father was housed at the Mount Pleasant facility, that drawback was eased by

his move to Newton. Counsel also debunked the notion prison visitation would always be traumatizing to a toddler:

> There are facilities at Newton. I've seen the pictures. They didn't allow us to download them. But they have very nice visitation rooms at most of the penitentiaries in the State, designed to allow children to interact with their parents without really even understanding that they are in a prison. It's more like a playroom.

Counsel was critical of the State's reliance on the recommendation from the child's therapist not revealed on the record.

The State insisted it satisfied the reasonable-efforts mandate despite not offering any visitation to the father. In closing, the county attorney asserted: "The State did not rely on the opinion of the therapist in determining whether or not visitation was appropriate." The county attorney rationalized:

> We have to take these cases as we find them, and when we found them, the father was incarcerated in Mount Pleasant, a two-and-a-half-hour drive one-way, a five-hour trip for a child 14 months of age who has never met her father.
> We also have to look at the reality of the sentence and the likelihood that he'll be in the community at any time in the near future to provide for his child when deciding whether or not to establish any relationship.[4]

The majority accepts the State's rationale as an appropriate assessment under the factors in *S.J.* I respectfully disagree. Just because the DHS identified proper considerations does not mean its ultimate decision to deny visitation throughout the case is supported by the record.

Let's start with the age of the child, the first factor mentioned in *S.J. See* 620 N.W.2d at 525. True, D.S. was a toddler, but the State offered no evidence her tender age automatically weighed against visitation with her incarcerated

---

[4] The father's attorney asserted the father was likely to be paroled in March 2019.

father. Also true, the father had little to no relationship with the child before removal. But absence of a preexisting bond would not excuse the DHS from facilitating visitation to develop a relationship with a father who was not incarcerated.

The most compelling reason for not setting up visitation may have been the original lengthy commute between West Des Moines and Mount Pleasant. But our case law does not provide much guidance on how far is too far to require a child to be transported to visit a parent as part of the reasonable-efforts determination. *See, e.g.*, *In re J.H.*, No. 17-0205, 2017 WL 1400927, at *3 (Iowa Ct. App. Apr. 19, 2017) (finding 400-mile round-trip was prohibitive distance for FSRP worker to transport seven-year-old); *S.J.*, 620 N.W.2d at 525 (observing father's imprisonment at "a distant facility" rendered "any provision of reunification services infeasible"). But even when the father moved to Newton, the DHS did not reconsider the possibility of bringing D.S. for a visit.

The State offered no clinical or therapeutic reasons for not introducing D.S. to her father. The State pointed to the father's previous drug dealing, which was obviously a legitimate concern, but did not offer any evidence he would be an unfit parent if not incarcerated. *See L.M.*, 904 N.W.2d at 841 (Cady, C.J., dissenting) (opining while child's best interest is polestar, we cannot ignore parental rights, even if the parent has trafficked drugs).

The State's denial of visitation focused on the "reality" the father would not be released from prison with the tight time frames provided for establishing permanency in child-welfare cases under chapter 232. Those time frames reflect the well-intentioned dictates of the Adoption and Safe Families Act of 1997 (ASFA),

which is structured to move children from foster care to adoption placements quickly.[5] But ASFA's timeframes, in practical application, often deprive incarcerated parents of protections afforded non-incarcerated parents. *See* Amy B. Cyphert, *Prisoners of Fate: The Challenges of Creating Change for Children of Incarcerated Parents*, 77 Md. L. Rev. 385, 394 (2018). The ASFA deadlines pose a harsh reality for parents with long prison sentences; but the DHS cannot sidestep the reasonable-efforts mandate by presuming a parent will not be released from prison in time to resume custody of his or her child. And juvenile courts must provide a meaningful review of the DHS decision to deny visitation, independently deciding if the relevant factors weigh against allowing an incarcerated parent any interactions with his or her child. *See generally In re M.D.*, 921 N.W.2d 229, 237 (Iowa 2018) (noting the "role of the juvenile judge will continue to be the important driver of procedural fairness expected of courts").

---

[5] ASFA dramatically changed the manner in which this country treats children who have been removed from the care of their parents and placed into foster care. *See* Adoption and Safe Families Act of 1997, Pub. L. No. 105–89, 111 Stat. 2115 (codified as amended in scattered sections of 42 U.S.C.). The legislation sets firm deadlines for reunification, followed by prompt efforts to terminate parental rights if those deadlines are not met. *See* 42 U.S.C. § 675(5) (2006) (outlining the instances when termination of parental rights are required). ASFA's goals seek to prevent children from languishing in foster care by requiring parents to assume their parental responsibility quickly. *See In re C.M.*, 652 N.W.2d [204,] 208 [(Iowa 2002)] ("[T]he new federal law shifted the focus from family reunification to 'time-limited family reunification services.'" (quoting 42 U.S.C. § 629(a)(7))); 42 U.S.C. § 675(5) (requiring the state to file a petition to terminate parental rights if the child has remained in foster care "for 15 of the most recent 22 months").

Iowa reacted to this federal legislation and adopted many changes to our child welfare laws in 1998. *See* [1998 Iowa Acts ch. 1190] (codified as amended in scattered sections of Iowa Code chapters 232, 237, 600). Among those changes are additions to Iowa Code § 232.116, which provides the grounds by which a court may terminate parental rights. Iowa Code § 232.116 (2005).

*In re J.E.*, 723 N.W.2d 793, 801–02 (Iowa 2006).

Because the DHS failed to offer any visitation to this incarcerated father, despite his "sincere" and "earnest" efforts to develop his parenting skills while in prison, he was deprived of the opportunity to prove he could care for the child. *See L.M.*, 904 N.W.2d at 841. I agree with the father's argument the juvenile court should have ordered a six-month extension of permanency to allow him to "begin therapeutically appropriate visits" with D.S.